MICHAEL J. NADER, CA Bar No. 200425
michael.nader@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
500 Capitol Mall, Suite 2500
Sacramento, CA  95814
Telephone:    916-840-3150
Facsimile:    916-840-3159

ATTICUS LEE, CA Bar No. 298002
atticus.lee@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Embarcadero Center, Suite 900
San Francisco, CA  94111
Telephone:    415-442-4810
Facsimile:    415-442-4870

Attorneys for Defendant
HELZBERG'S DIAMOND SHOPS, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDUARDO YBARRA, an individual, on behalf of himself and on behalf of all persons similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>HELZBERG'S DIAMOND SHOPS, LLC, a Missouri Limited Liability Company; and DOES 1-50, inclusive,<br><br>　　　　　Defendant. | Case No.<br><br>**DEFENDANT HERZBERG'S DIAMOND SHOPS, LLC'S NOTICE OF REMOVAL TO FEDERAL COURT**<br><br>[Filed concurrently with Declarations of Atticus Lee, Ariel Kumpinsky, and Lea Cummings; Disclosure Statement Pursuant to Federal Rule of Civil Procedure 7.1; and Civil Cover Sheet]<br><br>Action Filed:　　December 3, 2021<br>Trial Date:　　None Set |

**TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, AND TO PLAINTIFF AND HIS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT defendant HELZBERG'S DIAMOND SHOPS, LLC ("Defendant") removes this action from the Superior Court of the State of California for the County of Alameda to the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453. As discussed below, this Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act ("CAFA").

## I.    THE STATE COURT ACTION & TIMELINESS OF REMOVAL

1.    On December 3, 2021, plaintiff EDUARDO YBARRA ("Plaintiff") filed an unverified Class Action Complaint for Damages ("Complaint") in the Superior Court of the State of California, County of Alameda, entitled EDUARDO YBARRA, on behalf of himself and on behalf of all persons similarly situated v. HELZBERG'S DIAMOND SHOPS, LLC, case number 21CV003531 (the "State Court Action"). The Complaint asserts claims for: (1) violation of Business & Professions Code § 17200, et seq.; (2) failure to pay minimum wages under Labor Code §§ 1194, 1197, and 1197.1; (3) unpaid overtime wages under Labor Code §§ 510 and 1198; (4) meal period violations under Labor Code §§ 226.7 and 512(a); (5) rest period violations under Labor Code § 226.7; (6) wage statement violations under Labor Code § 1174(d); (7) failure to timely pay wages under §§ 201-203; (8) unreimbursed business expenses under Labor Code §§ 2800 and 2802; and (9) violation of the Private Attorneys General Act ("PAGA"), Labor Code §§ 2698, *et seq*. A true and correct copy of the Complaint served on Defendant in the State Court Action is attached hereto as **Exhibit A**.

2.    On January 3, 2022, Defendant signed and returned the Notice of Acknowledgment of Receipt of Plaintiff's Complaint, thereby accepting service as of January 3, 2022. Declaration of Atticus Lee ("Atticus Lee Decl."), ¶ 3.

3.    As further required by 28 U.S.C. § 1446(a), Defendant hereby provides this Court with copies of all process, pleadings, and orders received by Defendant in this action. True and correct copies of these documents are attached as **Exhibit B** to this Notice of Removal.  Defendant has not been served with any pleadings, process, or orders besides those attached. Lee Decl., ¶ 4.

4.    A defendant in a civil action has thirty (30) days from the date it is served with a summons and complaint in which to remove the action to federal court.  28 U.S.C. § 1446(b); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc*., 526 U.S. 344, 347-48 (1999).  As Defendant accepted service of the summons and Complaint on January 3, 2022, this Notice of Removal is timely.  28 U.S.C. § 1446(b).

## II.    JURISDICTION UNDER THE CLASS ACTION FAIRNESS ACT

5.    As set forth below, Plaintiff's claims as alleged in the Complaint are removable under

the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).

6.   Under CAFA, the Federal District Court has jurisdiction if:

a)      There are at least 100 class members in all proposed plaintiff classes; and

b)      The combined claims of all class members exceed $5 million exclusive of interest and costs; and

c)      Any class member (named or not) is a citizen of a different state than any defendant. 28 U.S.C. §§ 1332(d)(2), 1332(d)(5)(B) and 1453(a).

7.   This action is one over which this Court has original jurisdiction under CAFA and is one which may be removed by Defendant pursuant to 28 U.S.C. §§ 1441 and 1453, because the number of potential class members exceeds 100, the parties are citizens of different states, and the amount in controversy exceeds the aggregate value of $5,000,000. *See* 28 U.S.C. §§ 1332(d)(2) and (d)(6).

8.   There is no anti-removal presumption for cases invoking the CAFA. *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019).  Three principles must apply to CAFA removals. First, a removing defendant's notice of removal "need not contain evidentiary submissions" but only plausible allegations of the jurisdictional elements. *Id*. (quoting *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015)). "Second, when a defendant's allegations of removal jurisdiction are challenged, the defendant's showing on the amount in controversy may rely on reasonable assumptions. *Id.* "Third, when a statute or contract provides for the recovery of attorneys' fees, prospective attorneys' fees must be included in the assessment of the amount in controversy." *Arias*, 936 F.3d at 922. In assessing the amount in controversy, a removing defendant is permitted to rely on "a chain of reasoning that includes assumptions." *Id*. at 925. An assumption may be reasonable if it is founded on the allegations of the complaint. *Id*. Assumptions made part of the defendant's chain of reasoning need not be proven; they instead must only have 'some reasonable ground underlying them.'" *Id*. at 927 (quoting *Ibarra*, 775 F.3d at 1199). "The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability." *Id*. at 927 (quoting *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010)). "In that sense, the amount in controversy reflects the maximum recovery

1   the plaintiff could reasonably recover." *Id.* at 927 (citing *Chavez v. JPMorgan Chase & Co.*, 888

2   F.3d 413, 417 (9th Cir. 2018) (explaining that the amount in controversy includes all amounts "at

3   stake" in the litigation at the time of removal, "whatever the likelihood that [the plaintiff] will

4   actually recover them")). Pursuant to these principles, this case falls squarely within CAFA

5   jurisdiction and before this Court's jurisprudence.

6           **A.    The Size of the Putative Class Exceeds 100**

7           9.    Plaintiff defines the proposed class as: "all persons who are or previously were

8   employed by DEFENDANT in California and classified as non-exempt employees (the

9   'CALIFORNIA CLASS') at any time during the period beginning four (4) years prior to the filing

10  of this Complaint and ending on the date as determined by the Court (the 'CLASS PERIOD')."

11  Exhibit. A, ¶ 7.

12          10.    Based on a review of Defendant's employment records, Defendant employed

13  approximately 376 individuals as hourly non-exempt employees who fall within Plaintiff's proposed

14  class (collectively referred to as the "putative class members" or "PCMs") during the class period.

15  Declaration of Ariel Kumpinsky ("Kumpinsky Decl."), ¶ 5. With 376 PCMs, the first requirement of

16  CAFA jurisdiction is satisfied.

17          **B.    The Parties Are Diverse**

18          11.    For diversity purposes, a person is a "citizen" of the state in which he or she is

19  domiciled. *Kantor v. Wellesley Galleries, Ltd*., 704 F.2d 1088, 1090 (9th Cir. 1983). Residence is

20  prima facie evidence of domicile. *State Farm Mut. Auto Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir.

21  1994); *Marroquin v. Wells Fargo, LLC*, 2011 WL 476540, at *1 (S.D. Cal. Feb. 3, 2011) (relying on

22  State Farm); *Smith v. Simmons*, 2008 WL 744709, at *7 (E.D. Cal. Mar. 18, 2008) (same); *see also*

23  *Lew v. Moss*, 797 F.2d 747, 751 (9th Cir. 1986) (allegations of residency in a state court Complaint

24  can create a rebuttable presumption of domicile supporting diversity of citizenship).

25          12.    <u>Citizenship of Plaintiff Ybarra</u>.  Defendant is informed and believes that Plaintiff was,

26  at the time of the filing of the Complaint, and still is, a resident and citizen of the State of California.

27  Declaration of Lea Cummings ("Cummings Decl."), ¶ 6. Defendant's employment records confirm

28  that throughout his employment with Defendant, Plaintiff lived in the State of California, including

1  the home address that Plaintiff provided for payroll purposes in the city of Discovery Bay, which

2  was issued by the State of California. Cummings Decl., ¶ 7.  Thus, Plaintiff is a citizen of the State

3  of California.

4          13.     Citizenship of Plaintiff and Putative Class Members.  Members of the proposed class,

5  who by definition are or were employed in California, are presumed to be primarily citizens of the

6  State of California. *See, e.g., Lew v. Moss*, 797 F.2d 747, 750 (9th Cir. 1986) ("place of employment"

7  an important factor weighing in favor of citizenship).  Thus, even if Plaintiff was somehow a citizen

8  of a different state (and there is no evidence that he is), there is no possible way that the putative

9  class members, all of whom worked in California (Ex. A (Complaint), ¶ 7), were also citizens of a

10 state other than California.

11         14.     Citizenship of Defendant.  The citizenship of a limited liability company for diversity

12 purposes is determined by examining the citizenship of each member of the company. *Johnson v.*

13 *Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). A corporation is deemed a

14 citizen of its state of incorporation and the state where it has its principal place of business. 28 U.S.C.

15 § 1332(c)(1); *Hertz Corp. v. Friend* (2010) 559 U.S. 77, 80 (the principal place of business is "where

16 the corporation's officers direct, control and coordinate the corporation's activities"). Helzberg's

17 Diamond Shops, LLC was, at the time of filing of the State Court Action, and remains, incorporated

18 according to the laws of the State of Missouri. Cummings Decl., ¶ 4. Its principal place of business,

19 where corporate leadership is located and where direction, control, and coordination of the company

20 reside, is in North Kansas City, Missouri. *Id.* at ¶¶ 4-5. Accordingly, Defendant is, and has at all

21 times during the relevant period, been a citizen of the state of Missouri.

22         15.     Based on the foregoing, the minimal diversity of citizenship requirements under 28

23 U.S.C. § 1332(d)(2) are met because Defendant is a citizen of Missouri while Plaintiff, a putative

24 class member, is a citizen of California.

25         16.     There are no other defendants whose consent or joinder are required for removal.

26         17.     Removal and intra-district assignment to this Court is proper because Defendant

27 conducts business within the County and City of Alameda.

28

**C.**    **The Amount in Controversy Exceeds an Aggregate of $5,000,000**

18.    CAFA authorizes the removal of class-action cases in which the amount in controversy for all class members exceeds $5 million.  28 U.S.C. § 1332(d).

19.    In the Complaint, Plaintiff seeks, among other things, unpaid minimum and overtime wages, unpaid meal and rest break premiums, wage statement penalties, and waiting time penalties during the applicable statutory periods on behalf of himself and the putative class members.  (See generally Ex. A.)  As set forth below, even when factoring in potential amounts in controversy for less than half of the total claims asserted, the amount in controversy still exceeds the $5 million threshold for CAFA removal.   See 28 U.S.C. § 1332(d).

20.    In order to remove a class action pursuant to CAFA, the amount in controversy must exceed $5,000,000, and it is the removing party's burden to establish "by a preponderance of evidence, that the aggregate amount in controversy exceeds the jurisdictional minimum." *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 981 (9th Cir. 2013).  To do so, the removing defendant must "produce underlying facts showing only that it is *more likely than not* that the amount in controversy exceeds $5,000,000.00, assuming the truth of the allegations plead in the Complaint." *Muniz v. Pilot Travel Ctrs. LLC*, No. CIV. S-07-0325 FCD EFB, 2007 WL 1302504, at *5 (E.D. Cal. May 1, 2007) (emphasis in original).

21.    Plaintiff's Complaint alleges that the amount in controversy for the aggregate claims of the California Class Members is under five million dollars. Ex. A, ¶7.  However, California courts have long established that an amount in controversy cannot be reasonably derived from this bare-bones allegation. *See, e.g.*, *Zhao v. Relay Rides, Inc.*, 2017 WL 6336082, *12 (N.D. Cal. Dec. 12, 2017) (complaint "contained no specific allegations regarding the size of the two proposed classes," "the amount of either [the plaintiff's] damages or the damages of the class as a whole"). In this case, Plaintiff's Complaint does not state the specific number of people in the putative class, provides no estimated number of work weeks at issue, or any factual basis for his imprudent and inaccurate legal conclusion that the aggregate amount-in-controversy falls below five million dollars. In contrast, as demonstrated in Defendant's amount-in-controversy estimates below and in its supporting documentation, Defendant has run extensive reports and located much of the information needed to

Case No.

1    derive these figures, even with an assumed violation rate.  As described below in greater detail, the

2    violation rate assumptions used by Defendant are creatures of case law, allowing assumptions to be

3    made regarding the violation rate when plaintiffs use key, but indeterminate, phrasing in their

4    complaints, such as "pattern" and "systematically" and "uniform."  Using assumptions endorsed by

5    the Courts allows the Parties to ascertain the alleged amount in controversy despite Plaintiff's vague

6    and boilerplate Complaint.

7         22.    In considering the evidence submitted by the removing defendant, the Court must

8    "look beyond the complaint to determine whether the putative class action meets the [amount in

9    controversy] requirements," adding "the potential claims of the absent class members" and attorneys'

10   fees.  *Rodriguez*, 728 F.3d at 981 (citing *Standard Fire Ins. Co. v. Knowles*, 133 S.Ct. 1345, 185

11   L.Ed. 2d 439 (2013)); *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 705 (9th Cir. 2007).

12   Furthermore, "[i]n considering whether the amount in controversy is clear from the face of the

13   complaint, a court must assume that the allegations of the complaint are true and that a jury will

14   return a verdict for the plaintiff on all claims made in the complaint."  *Altamirano v. Shaw Indus.,

15   Inc.*, C-13-0939 EMC, 2013 WL 2950600, at *4 (N.D. Cal. June 14, 2013) (citing *Korn v. Polo Ralph

16   Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008)); *see also Muniz*, 2007 WL 1302504, at

17   *3.

18        23.    Defendant denies the validity of Plaintiff's claims and requests for relief, Defendant

19   does not concede in any way that the allegations in the Complaint are accurate, or that Plaintiff's

20   claims are amenable to classwide treatment, or that Plaintiff or the purported class are entitled to any

21   of the requested relief.  However, for purposes of this removal, Defendant submits that the allegations

22   in the Complaint show that it is more likely than not that the amount in controversy exceeds the

23   jurisdictional minimum.  *See Guglielmino*, 506 F.3d at 700.

24        24.    As described further below, as well as in the concurrently filed declaration from Ariel

25   Kumpinsky, the amount in controversy exceeds the jurisdictional minimum of $5,000,000.[1]

26

27   _____
     [1] For purposes of effecting removal pursuant to 28 U.S.C. § 1332(d), declarations from defendants and their counsel
     constitute sufficient evidence to establish the amount in controversy.  *See, e.g., Muniz*, 2007 WL 1302504, at *2, *5
28   (relying on the evidence submitted by the defendant in the form of a declaration from its employee relations manager,
     which "set forth the underlying facts needed to calculate the amount in controversy," and a declaration from its counsel,
     which calculated the amount in controversy based on the underlying facts and in light of the laws governing the plaintiff's

25.     In determining the amount in controversy to support its Notice of Removal, Defendant applied conservative violation rates to calculate the amount in controversy based only on damages sought by Plaintiff as a result of the alleged: (1) unpaid minimum wages; (2) unpaid overtime wages; (3) failure to provide legally required and legally compliant meal periods; (4) failure to provide legally required and legally compliant rest periods, (5) failure to pay all wages owed at termination, (6) failure to timely pay wages owed; (7) failure to provide accurate wage statements; (8) failure to reimburse for business expenses; and (9) unfair, unlawful, and harmful business practices.   As Kumpinsky's Declaration explains, the amounts in controversy for these claims easily satisfy the jurisdictional minimum requirement of $5 million.

26.     Defendant also based its removal calculations only on actual data reviewed for 344 current and former employees who held non-administrative hourly positions for varying time spans during the four year limitations period.[2] Kumpinsky Decl., ¶¶ 7-10.  Thus, Defendant used a smaller class than that alleged by the Plaintiff.  If necessary, Defendant could and would supplement this Notice of Removal to include estimates of the additional amounts in controversy based on the allegations contained in the Complaint and for the entire proposed class, however, this matter meets the amount in controversy limit even with the reduced class figures

(a)     **The Amount Placed in Controversy by Unpaid Minimum Wages**

27.     Plaintiff alleges that Defendant failed to pay minimum wage compensation to Plaintiff and other putative class members when employees were required to work off-the-clock.  Specifically, Plaintiff alleges that Defendant "required Plaintiff and the other members of the California Class to perform off-the-clock pre-shift and post-shift work" such as "setting up the store prior to business hours, which included contacting the security company to unlock the door, disarm the store alarm

_____

claims, and finding that the defendant had shown that "it is more likely than not that the jurisdictional threshold of $5,000,000.00 is met"); *Jasso v. Money Mart Express, Inc.*, No. 11-CV-5500 YGR, 2012 WL 699465, at *4 (N. D. Cal. Mar. 1, 2012) (finding there was "adequate foundation" for the declaration submitted by the defendant's human resources director regarding "the numbers of employees, payperiods [sic] and average rates of pay during the applicable limitations periods," which was derived from a compilation of "information that is kept in the normal course of business," and relying on the declaration to find that the defendant had met its burden to establish the amount in controversy in excess of CAFA's jurisdictional threshold).

[2]. Not all class data for the entire class period was easily available for analysis. As a result, only a portion of the data was analyzed for the below estimate, for 344 employees. However, even with a portion of class data absent, the amount in controversy easily reaches the jurisdictional minimum.

and wait for the punch out system to boot up before being able to clock in." Ex. A, ¶¶ 30-32. Plaintiff also alleges that he and other putative class members "have uniformly been deprived of wages and penalties from unpaid wages earned and due, including but not limited to unpaid minimum wages […]." Ex. A, ¶ 40. Plaintiff also alleges that, "as a matter of company policy, practice, and procedure, intentionally, knowingly, and systematically … failed to pay Plaintiff and the other members of the California class for all time worked." (Ex. A ¶ 13). Additionally, Plaintiff alleges that Defendant "failed to pay Plaintiff and other members of the California Class necessary wages for attending for performing work [sic] at Defendant's direction, request and benefit, while off-the-clock." Ex. A, ¶ 30. Plaintiff also alleges that Defendant implemented a "uniform policy and practice that denied accurate compensation to Plaintiff and the other members of the California class in regards to minimum wage pay." Ex. A, ¶¶ 73, 87.

28.    While Plaintiff does not provide a clear number of minimum wage violations alleged, applying a weekly hour violation rate has been accepted by the federal courts as a reasonable and conservative figure where the plaintiff fails to provide specific allegations concerning the frequency of which he worked without being provided the requisite minimum wage compensation.

29.    Labor Code Section 1194(a) provides:
>    Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit.

30.    Based on a review of Defendant's available business records for 344 non-exempt employees and assuming that every PCM was owned one hour of unpaid minimum wage for each week that they worked, there were 21,064 potential unpaid minimum wage hours at issue in this case. Kumpinsky Decl., ¶¶ 28-31. Multiplying this number of unpaid minimum wage hours by the average regular rate of $22.06: $22.06 x 21,064 hours = $464,671.84. *Id*. at ¶¶ 28-30. Additionally, under California Labor Code § 1194.2, each employee is entitled to recover liquidated damages in the amount equal to their unpaid wages plus interest. Even disregarding the interest in this case to simplify the calculations, and limiting liquidated damages to the three-year statute of limitations, the liquidated damages total $335,620.84. *Id*. at ¶ 31. Consequently, the amount placed in controversy

1    by the failure to pay overtime is at least **$800,292.68**. *Id*. at ¶ 31.

2                    **(b)    The Amount Placed in Controversy by Unpaid Overtime Wages**

3           31.    In his Third Cause of Action, Plaintiff also alleges that Defendant failed to pay

4    overtime compensation to Plaintiff and other putative class members. Specifically, Plaintiff alleges

5    that "Defendants failed and continue to fail to accurately calculate and pay Plaintiff and the other

6    California Class Members for their overtime hours worked…" and "as a result, Plaintiff and the other

7    California Class Members forfeited wages due them for working overtime without compensation at

8    the correct overtime [] rates." Ex. A, ¶ 17.  Plaintiff also alleges that Defendant's practice of requiring

9    employees to work off-the-clock for pre-shift duties related to disarming the security system and

10   post-shift duties related to mandatory loss prevention inspections "deprived Plaintiff and the other

11   members of the California Class of … overtime and double time wages off for the off-the-clock work

12   activities" Ex. A., ¶¶ 30-38. Plaintiff also alleges that Defendant implemented a "uniform pattern of

13   unlawful wage and hour practices manifested, without limitation, applicable to the California Class

14   as a whole, as a result of implementing a uniform policy and practice that failed to accurately record

15   overtime worked by Plaintiff and other California Class Members and denied accurate compensation

16   to Plaintiff and the other members of the California Class for overtime worked, including, the

17   overtime work performed in excess of eight (8) hours in a workday, and/or twelve (12) hours in a

18   workday, and/or forty (40) hours in any workweek." Ex. A, ¶ 87.   And Plaintiff alleges that, "as a

19   matter of company policy, practice, and procedure, intentionally, knowingly, and systematically …

20   failed to pay Plaintiff and the other members of the California Class overtime at the correct regular

21   rate of pay, …." (Ex. A ¶ 13).

22          32.    While Plaintiff does not provide a clear number of overtime violations alleged,

23   applying a weekly hour violation rate has been accepted by the federal courts as a reasonable and

24   conservative figure where the plaintiff fails to provide specific allegations concerning the frequency

25   of which he worked overtime without being provided the requisite compensation. *See Byrd v.*

26   *Masonite Corp.*, No. EDCV 16-35 JGB (KKX), 2016 WL 2593912, at *5 (C.D. Cal. May 5, 2016).

27   *See Jasso v. Money Mart Express, Inc.*, No. 11-CV-5500 YGR, 2012 WL 699465, at *5-6 (N. D.

28   Cal. Mar. 1, 2012) (holding that calculating at least one violation per week was a "sensible reading

of the alleged amount in controversy"); *Ray v. Wells Fargo Bank, N.A.*, No. CV 11-01477 AHM (JCx), 2011 WL 1790123, at *6-7 (C.D. Cal. May 9, 2011).

33.     Based on a review of Defendant's available business records for 344 non-exempt employees during the putative class period, and applying a conservative assumption of one hour of unpaid overtime to each week worked, the number of potential allegedly unpaid overtime hours would be 21,064.  Kumpinsky Decl., ¶¶ 25-27. Multiplying this number of overtime hours by the average time-and-a-half overtime rate equates to $697.007.76. *Id*. at ¶ 26-27. Consequently, the amount placed in controversy by the failure to pay overtime is at least **$697,007.76**.  *Id*. at ¶ 27.

### (c)     The Amount Placed in Controversy by the Failure to Provide Required Meal Periods Claim

34.     In his Fourth Cause of Action, Plaintiff alleges that "during the class period, Defendants [sic] required Plaintiff and California Class Members to work without paying them for all the time they were under Defendants' control" and that "as a result of Plaintiff's demanding work requirements, being required to oversee the jewelry store and assist customers, and Defendant's understaffing, Defendants required Plaintiff to work while clocked out during what was supposed to be Plaintiff's off-duty meal break." Exhibit A, ¶ 14. Plaintiff also alleges that "there were many days where Plaintiff did not even receive a partial lunch." Exhibit A, ¶ 14. Plaintiff also alleges that he and other putative class members "have uniformly been deprived of wages and penalties from unpaid wages earned and due, including but not limited to . . . unpaid meal and rest period premiums, [and] illegal meal and rest period policies [...]." Ex. A, ¶ 40.  And Plaintiff alleges that, "as a matter of company policy, practice, and procedure, intentionally, knowingly, and systematically … failed to provide legally compliant meal and rest periods, …" (Ex. A ¶ 13).

35.     Under California law, employees who are not provided meal periods are entitled to one hour of premium pay for each day that a meal period is not provided.  *See Cabrera v. S. Valley Almond Co., LLC, No. 121CV00748AWIJLT*, 2021 WL 5937585, at *6 (E.D. Cal. Dec. 16, 2021); *Marlo v. United Parcel Serv., Inc.*, 2009 WL 1258491, at *7 (C.D. Cal. May 5, 2009). Meal period claims are properly considered in determining the amount in controversy. *See, e.g.*, *Muniz*, 2007 WL 1302504, at *4; *Helm v. Alderwoods Grp., Inc.*, 2008 WL 2002511, at *8 (N.D. Cal. May 7, 2008).

36.     When determining the amount placed in controversy by a plaintiff's allegations

regarding a common "policy or practice of" and "routine" meal period violation, a 20% violation rate that is uniformly applied across all members of the putative class period is both reasonable and conservative. *Cabrera v. S. Valley Almond Co.*, 2021 WL 5937585; *Danielsson v. Blood Centers of Pac.*, No. 19-CV-04592-JCS, 2019 WL 7290476, at *6 (N.D. Cal. Dec. 30, 2019); *Chavez v. Pratt (Robert Mann Packaging), LLC*, No. 19-CV-00719-NC, 2019 WL 1501576, at *3 (N.D. Cal. Apr. 5, 2019) (finding that a 20% violation rate for meal and rest period was reasonable where the plaintiff alleged a "pattern or practice" of violations); *Mendoza v. Savage Servs. Corp.*, No. 2:19-CV-00122-RGK-MAA, 2019 WL 1260629, at *2 (C.D. Cal. Mar. 19, 2019) (finding that a 20% violation rate for meal and rest breaks was reasonable where the complaint alleged a "pattern and practice" of violations, and noting that courts in the Central District of California "routinely apply a 20% violation rate... for meal and rest period premiums" and citing cases).

37.     Based on a review of Defendant's available business records for 344 PCMs during the putative class period, PCMs worked at least 80,428 shifts with more than five hours of shift time recorded. Kumpinsky Decl., ¶ 18. Assuming a 20% violation rate, there would be a total number of 16,227 alleged meal period violations. *Id.* at ¶ 20. Utilizing the average hourly wage rate of $22.06/hour, the amount of total missed period premiums would be $357,967.62. *Id.* at ¶ 21. Accordingly, Plaintiff's claim for failure to provide legally compliant meal periods places an amount in controversy of at least **$357,967.62.** *Id.* at ¶ 21.

### (d)     The Amount Placed in Controversy by the Failure to Authorize and Permit Rest Breaks Claim

38.     In his Fifth Cause of Action, Plaintiff alleges that he and other California Class Members "were required to work in excess of four (4) hours without being provided ten (10) minute [sic] rest periods," and that "these employees were denied their first rest periods of at least ten (10) minutes for some shifts worked of at least two (2) to four (4) hours, a first and second rest period of at least ten (10) minutes for some shifts worked between six (6) and eight (8) hours, and a first, second, and third rest period of at least ten (10) minutes for some shifts worked ten (10) hours or more." Ex. A, ¶ 102. Plaintiff also alleges that "[a]s a result of their rigorous work schedules, Plaintiff and other California Class Members were periodically denied their proper rest periods by Defendant and Defendant's managers." Ex. A, ¶ 102. Plaintiff also alleges that "Defendant did not have a policy

1  or practice which paid for off-duty rest periods to Plaintiff and the other California Class Members

2  when they worked as non-exempt sales employees." Ex. A, ¶ 102.

3      39.    Under California law, employers must provide at least one 10-minute rest period for

4  shifts 3.5 hours or greater. *Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal. 4th 1004, 1029 (2012). Employees

5  who are not provided the opportunity to take a rest period are entitled to one hour of premium pay

6  for each day that the opportunity to take a rest period is not provided. *United Parcel Serv. Wage &*

7  *Hour Cases*, 196 Cal. App. 4th 57, 63 (2011). Rest period claims are properly considered in

8  determining the amount in controversy. *See, e.g.*, *Olson v. Becton, Dickinson & Co.*, 19-cv-865-

9  MMA, 2019 WL 4673329, *4-5 (S.D. Cal. Sept. 25, 2019); *Arias v. Residence Inn by Marriott*, 936

10  F.3d 920, 926-27 (9th Cir. 2019).

11      40.    As with the meal period violations, applying a 20% violation rate is both reasonable

12  and conservative where the Plaintiff contends that Defendant's policies, practices or routines caused

13  Plaintiff and other employees to miss their rest breaks. *See Cabrera v. S. Valley Almond Co., LLC,*

14  *No. 121CV00748AWIJLT*, 2021 WL 5937585, at *6 (E.D. Cal. Dec. 16, 2021); *Danielsson*, 2019

15  WL 7290476, at *6; *Chavez*, 2019 WL 1501576, at *3; *Mendoza*, 2019 WL 1260629, at *2. Here, as

16  with Plaintiff's meal period allegations, Plaintiff alleges that he and other putative class members

17  were subject to a violation for each and every rest period where a premium was not provided. Ex.

18  A., ¶¶ 16, 102.

19      41.    The computation of the amount in controversy is based on a violation rate that only

20  considered shifts that were more than three and a half hours, and the assumption of a 20% violation

21  rate of only those shifts eligible for a rest break. Kumpinsky Decl., ¶¶ 22-23. Based on a review of

22  Defendant's business records, there were 86,115 shifts with more than three and a half hours

23  recorded. *Id*. at ¶ 22. Assuming a 20% violation rate, the total number of potential rest break

24  violations would be 17,358. *Id*. at ¶ 23. Utilizing the average hourly pay rate of $22.06/hour, the total

25  missed rest break premiums would be $382,917.48. *Id*. at ¶ 24. Accordingly, Plaintiff's claim for

26  failure to provide legally compliant rest periods places an amount in controversy of at least

27  **$382,917.48**. *Id*. at ¶ 24.

28           **(e)    The Amount Placed in Controversy by Wages Owed at
                      Termination**

42.    Plaintiff's Complaint also alleges that Defendant failed to pay all earned wages at separation from employment.  Ex. A, ¶¶ 114-116. This appears to be a derivative claim based on Defendant's alleged pattern and practice of failing to pay for all time worked (Ex. A, ¶¶ 109-116), including regular and overtime wages, and of failing to provide meal and rest breaks, that all those allegedly consistent and systematic violations also resulted in departing employees being allegedly deprived of their final wages.  And Plaintiff alleges that, "as a matter of company policy, practice, and procedure, intentionally, knowingly, and systematically … failed to pay Plaintiff and the California Class for all time worked." (Ex. A ¶ 13).

43.    Section 203 penalties "accrue not only on the days that the employee might have worked, but also on nonworkdays," for up to 30 days, and the accrual of these penalties "has nothing to do with the number of days an employee works during the month."  *Mamika v. Barca*, 68 Cal. App. 4th 487, 492-93 (1998).  As the "targeted wrong" addressed by Section 203 is "the delay in payment" of wages, that wrong "continues so long as payment is not made"; therefore, "[a] proper reading of section 203 mandates a penalty equivalent to the employee's daily wages for each day he or she remained unpaid up to a total of 30 days."  *Id.* at 493.

44.    Because Plaintiff alleges that the unpaid wages were the result of systemic and consistent illegal practices, it is reasonable to calculate the amount in controversy for this claim based on a 30-day penalty calculated at each former employee's daily wage rate.  See *Quintana v. Claire's Stores, Inc.*, No. 13-0368-PSG, 2013 WL 1736671, at *6 (N.D. Cal. Apr. 22, 2013) (finding that the defendants' waiting time penalties calculation was "supported by Plaintiffs' allegations" and was "a reasonable estimate of the potential value of the claims" where the complaint alleged that the defendants "'regularly required'" putative class members to work off-the-clock without compensation, and the defendants estimated that each putative class member "potentially suffered at least one violation that continues to be unpaid"); *Stevenson v. Dollar Tree Stores, Inc.*, No. CIV S-11-1433 KJM, 2011 WL 4928753, at *4 (E.D. Cal. Oct. 17, 2011) (finding it reasonable for the defendant to assume, in light of the allegations in the complaint that members of the putative class "'routinely'" missed meal periods, that "all members of the proposed class . . . would have missed a meal period as described in the complaint at least once and were thus entitled to the waiting time

penalty").

45.     Based on a review of Defendant's available employment data, 171 putative class members were identified as terminated from December 3, 2018 through January 15, 2022. Kumpinsky Decl., ¶ 32. Assuming that each PCM worked 8 hours per day and calculating 30 days at the average PCM hourly rate of $22.06, the waiting time penalties in controversy amount to at least $905,342.40. *Id*. at ¶ 33. Consequently, the amount placed in controversy by Plaintiff's Waiting Time Penalties Claim alone is at least **$905,342.20**. *Id*. at ¶ 33.

### (f)     The Amount Placed in Controversy by Failure to Pay Wages in Timely Manner

46.     Plaintiff repeatedly seeks penalties under Labor Code section 204 by alleging that Defendant failed to timely pay wages during employment. Ex. A, ¶¶ 55, 69, 83.

47.     According to Labor Code sections 204 and 210, the penalty for untimely payment of wages is $100 for the first violation and $200 for every subsequent violation, with an additional penalty of 25% of the wages owed.

48.     Based on a review of Defendant's business records, there were 163 putative class members who were provided a wage statement from December 3, 2020 through January 15, 2022. Kumpinsky Decl., ¶ 35. These employees worked a total of at least 2,700 affected pay periods. *Id*. at ¶ 35. Applying the statutory $100 penalty for the first pay period for each employee, and the statutory $200 penalty for each subsequent pay period with an additional penalty of 25% of wages owed,  the total alleged penalties for Failure to Pay Wages in a Timely Manner in this case is $605,757.69. Consequently, the amount placed in controversy by this claim is at least **$605,757.69**. *Id*. at ¶ 36.

### (g)     The Amount Placed in Controversy by the Failure to Provide Accurate Wage Statements.

49.     Plaintiff's Sixth Cause of Action alleges that Defendant failed to provide the putative class with accurate wage statements in violation of Labor Code § 226(a). Specifically, Plaintiff alleges that "when Defendant did not accurately record Plaintiff's and other California Class Members' wages, and missed meal and rest breaks, and separately compensated rest periods, Defendant violated Cal. Lab. Code § 226 in that Defendant failed to provide an accurate wage statement in writing that properly and accurately itemizes all wages, and missed meal and rest periods

and reporting time wages [sic] owed to Plaintiff and the other members of the California Class and thereby also failed to set forth the correct wages earned by the employees." Ex. A, ¶ 107.  And Plaintiff alleges that, "as a matter of company policy, practice, and procedure, intentionally, knowingly, and systematically" failed to provide  … failed to pay Plaintiff with accurate itemized wage statements.  (Ex. A ¶ 13).

50.     Plaintiff asserts that, as a result of Defendant's alleged failure to provide wage statements in compliance with California law, Plaintiff and the putative class are entitled to statutory penalties pursuant to Labor Code § 226. *Id*. at ¶ Prayer of Relief.  In turn, Labor Code § 226(e) allows a plaintiff to seek penalties of: $50 per employee for the initial pay period in which a section 226(a) violation occurs; and $100 per employee for each subsequent pay period, not to exceed an aggregate penalty of $4,000 per employee. Cal. Labor Code § 226(e)(1).

51.     A 100% wage statement violation rate is reasonable when a complaint "makes broad allegations of systematic violations."   *Baker v. Propak Logistics, Inc.*, No. EDCV-191241-JGBSHKX, 2019 WL 4168998, at *4 (C.D. Cal. Sept. 3, 2019); see also *Torrez v. Freedom Mortg.*, Corp., 2017 WL 2713400, at *4 (C.D. Cal. June 22, 2017) (holding that an assumption of a 100% violation rate is reasonable in an amount-in-controversy calculation where Plaintiff made allegations that were "susceptible to broad interpretations").

52.     Here, given Plaintiff's allegations of systematic violations of meal and rest breaks and unpaid time worked, it is reasonable to assume at least one violation for every biweekly pay period. Upon review of Defendant's employment documents, 163 putative class members were provided a wage statement from December 3, 2020 through January 15, 2022, with a total of 2,700 affected pay periods. Kumpinsky Decl., ¶ 38. Assigning a penalty of $50 for the first pay period for each employee, and $100 for each subsequent pay period, and limiting each putative class member's penalty to a maximum of $4,000, the total amount placed in controversy would be at least $261,850.00. *Id*. at ¶ 38. Consequently, the amount placed in controversy by Plaintiff's Wage Statement Claim is at least **$261,850.00**.  *Id*. at ¶ 39.

**(h)     The Amount Placed in Controversy by the Failure to Reimburse Reasonable Business Expenses**.

53.     Plaintiff's Eighth Cause of Action alleges that Defendant failed to reimburse

employees for reasonable business expenses in violation of Labor Code §2802. Specifically, Plaintiff alleges that "during the class period, Defendants [sic] violated Cal. Lab. Code §2802, by failing to indemnify and reimburse Plaintiff and the members of the California Class for required expenses incurred in the discharge of their job duties for Defendants' benefit." Ex. A, ¶ 119.    More specifically, Plaintiff alleges that Defendant failed to reimburse the putative class members for expenses "which included, but were not limited to, costs related to using their personal cellular phone all on behalf of and for the benefit of Defendants," and that employees were "required by Defendants to use their personal cell phones to execute their essential job duties on behalf of Defendants." Ex. A, ¶ 119. Plaintiff also alleges that "Defendants' uniform policy, practice and procedure was to not reimburse Plaintiff and the members of the California Class for expenses resulting from using their personal cellular phones for Defendants within the course and scope of their employment for Defendants." Ex. A, ¶ 119.  And Plaintiff alleges that, "as a matter of company policy, practice, and procedure, intentionally, knowingly, and systematically" failed to reimburse business expenses. (Ex. A ¶ 13).

54.    Plaintiff asserts that, as a result of Defendant's alleged failure to provide reimbursements for necessary job-related expenditures, Plaintiff and the putative class are entitled to recovery pursuant to Labor Code § 2802. *Id*. at ¶ Prayer of Relief.

55.    Based on a review of Defendant's business records, there were 344 putative class members who had worked for at least one month from December 3, 2017 through January 15, 2022. Kumpinsky Decl., ¶ 41. These employees worked a total of at least 5,668 affected months. *Id*. at ¶ 41. Assuming $30.00 of unreimbursed expenses for each month worked, the total alleged penalties for Failure to Reimburse Business Expenses is $170,040.00.  Consequently, the amount placed in controversy by this claim is at least **$170,040.00**. *Id*. at ¶ 42.

**(i)    The Amount Placed in Controversy by the Failure to Pay All Wages at the Regular Rate of Pay.**

56.    Plaintiff asserts that, as a result of Defendant's non-discretionary incentive pay programs, "in those pay periods when Plaintiff and the California Class Members worked overtime and earned this non-discretionary bonus, commission, or incentive Defendants [sic] failed to accurately include the non-discretionary bonus compensation and/or commission and/or incentive

1  |  paid as part of the employees' 'regular rate of pay' and/or calculated all hours worked rather than

2  |  just all non-overtime hours worked." Ex. A, ¶ 19.

3  |       57.     Based on a review of Defendant's business records for 344 PCMs during the putative

4  |  class period between December 3, 2017 and January 15, 2022, and assuming that Defendant had paid

5  |  all applicable overtime, double time, sick, and meal premium hours without considering

6  |  commissions and other incentive compensation, the amount alleged to be at issue for this claim would

7  |  be $322,928.77. Kumpinsky Decl., ¶¶ 43-46. Consequently, the amount placed in controversy for

8  |  the alleged Failure to Pay All Wages at the Regular Rate of Pay is at least $322,928.77. *Id.* at ¶¶ 46.

9  |            **(j)**      **The Amount Placed in Controversy Includes Attorneys' Fees**

10 |       58.     The Ninth Circuit recently reaffirmed that "when a statute or contract provides for the

11 |  recovery of attorneys' fees, prospective attorneys' fees must be included in the assessment of the

12 |  amount in controversy." *Arias*, 936 F.3d at 922; see also *Fritsch v. Swift Transp. Co. of Arizona,*

13 |  *LLC*, 899 F.3d 785, 794 (9th Cir. 2018) ("We conclude that if a plaintiff would be entitled under a

14 |  contract or statute to future attorney's fees, such fees are at stake in the litigation and should be

15 |  included in the amount in controversy."); *Muniz*, 2007 WL 1302504 at *3 ("In measuring the amount

16 |  in controversy, a court must assume that the allegations of the complaint are true and that a jury will

17 |  return a verdict for the plaintiffs on all claims made in the complaint.").

18 |       59.     Here, Plaintiff claims that he is entitled to attorneys' fees for various alleged

19 |  violations of the California Labor Code. Ex. A, Prayer For Relief.[3]  The Court may consider all

20 |  attorneys' fees that at the time of removal can reasonably be anticipated will be incurred over the life

21 |  of the case. *See Fritsch*, 889 F.3d at 794 ("Because the law entitles [Plaintiff] to an award of

22 |  attorneys' fees if he is successful, such future attorneys' fees are at stake in the litigation, and must

23 |  be included in the amount in controversy."); *Goldberg v. CPC Int'l*, 678 F.2d 1365, 1367 (9th Cir.

24 |  1982) (noting that "potential attorneys' fees" could be considered for purposes of meeting the amount

25 |  in controversy requirement); *Haase v. Aerodynamics Inc.*, No. 2:09-cv-01751-MCE-GGH, 2009 WL

26 |  3368519, at *5 (E.D. Cal. 2009) ("[B]ecause attorney's fees are expressly authorized by statute, such

27 |

28 |  _____

[3] Plaintiff alleges attorneys' fees throughout his Complaint. As such, it is clear that attorneys' fees are properly included in the amount of controversy calculation.  Ex. A. ¶ 40, and Prayer for Relief.

Case No.

1    fees may be included in determining the amount in controversy . . . ."); *Brady v. Mercedes-Benz*
2    *USA, Inc.*, 243 F. Supp. 2d 1004, 1011 n.4 (N.D. Cal. 2002) ("While an estimate of the amount in
3    controversy must be made based on facts known at the time of removal, that does not imply that
4    items such as future income loss, damages, or attorneys' fees likely to be incurred cannot be estimated
5    at the time of removal."); *Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1034-35 (N.D. Cal. 2002)
6    (stating that "the measure of fees should be the amount that can reasonably be anticipated at the time
7    of removal, not merely those already incurred" and noting that "attorney's fees cannot be precisely
8    calculated" but making projection of likely fees based on the court's "twenty-plus years' experience"
9    overseeing similar cases).

10        60.    Under Ninth Circuit precedent, 25% of the common fund is generally used as a
11    benchmark for an award of attorney fees.  See *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th
12    Cir. 1998); *Barcia v. Contain-A-Way, Inc.*, 2009 U.S. Dist. LEXIS 17119, at *15 (S.D. Cal., Mar. 6,
13    2009) ("In wage and hour cases, '[t]wenty-five percent is considered a benchmark for attorneys' fees
14    in common fund cases.'") (citations omitted); *Muniz*, 2007 WL 1302504 at *4, n.8 (noting that in
15    California, where wage and hour class actions have settled prior to trial, it is not uncommon for an
16    attorneys' fee award to be in the realm of 25% to 30% of the settlement); *see also Jasso,* 2012 WL
17    699465, at *7 (noting that "it is well established that the Ninth Circuit 'has established 25% of the
18    common fund as a benchmark award for attorney fees'") (quoting *Hanlon v. Chrysler Corp.,* 150
19    F.3d 1011, 1029 (9th Cir. 1998)).

20        61.    Accordingly, Defendant applies a reasonable amount for Plaintiff's attorneys' fees in
21    of at least 25% of the amount placed in controversy through Plaintiff's claims, or **$1,126,026.10**.

22              **(2)    Summary of Defendant's Calculations**

23        62.    As described above, applying reasonable violation rates demonstrate that the amount
24    in controversy presented by Plaintiff's minimum wage, overtime wage, business reimbursement,
25    meal period, rest break, wage statement, untimely pay during employment and at termination, and
26    regular rate claims far exceeds $5,000,000. Indeed, these claims alone, for the reduced class, have
27    placed at least $5,630,130.49 in controversy, as follows:

28    / / / /

| Claim | Amount in Controversy |
|---|---|
| Unpaid Minimum Wages (incl. liquidated damages) | $800,292.68 |
| Unpaid Overtime Wages | $697,007.76 |
| Meal Period Claim | $357,967.62 |
| Rest Break Claim | $382,917.48 |
| Waiting Time Penalties | $905,342.40 |
| Failure to Timely Pay Wages | $605,757.69 |
| Wage Statements | $261,850.00 |
| Business Expense Reimbursements | $170,040.00 |
| Failure to Pay at the Regular Rate | $322,928.77 |
| Sub-Total | $4,504,104.4 |
| 25% Attorneys' Fees | $1,126,026.10 |
| **TOTAL** | $5,630,130.49 |

Consequently, the amount placed in controversy by Plaintiff's claims exceeds the $5,000,000 jurisdictional threshold of 28 U.S.C. § 1332(d).

### III.   DEFENDANT HAS SATISFIED THE REMAINING REMOVAL REQUIREMENTS

63.   _Venue is Proper_.  In accordance with 28 U.S.C. § 1446(a), this Notice of Removal is filed in the District in which the action is pending.  The Superior Court of the State of California for the County of Alameda is located within the Northern District of California.  Therefore, venue is proper in this Court because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

64.   In accordance with 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Defendant are attached as Exhibits to this Notice.

65.   In accordance with 28 U.S.C. § 1446(d), a copy of this Notice is being served upon counsel for Plaintiff, and a notice will be filed with the Clerk of the Superior Court of California for the County of Alameda.  Notice of compliance shall be filed promptly afterward with this Court.

66.    As required by Federal Rule of Civil Procedure 7.1, Local Rule 3-13, and Local Rule 3-15, Defendant concurrently filed its Certificate of Interested Parties, Corporate Disclosure Statement, and Notice of Related Cases.

67.    Finally, in the event this Court has any question regarding the propriety of this Notice of Removal, Defendant requests that the Court issue an Order to Show Cause so that Defendant may have an opportunity to more fully brief the basis for this removal.

WHEREFORE, Defendant removes the above-captioned action to the United States District Court for the Northern District of California.

DATED:  February 2, 2022

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By:  /s/ Atticus Lee
     Michael J. Nader
     Atticus Lee

     Attorneys for Defendant
     HELZBERG'S DIAMOND SHOPS, LLC

Case No.